IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| THOMAS DIERKS and JOHN DOE,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LINCOLN, NEBRASKA; LINCOLN COMMISSION ON HUMAN RIGHTS; JAMIE REYES, in her official capacity as DIRECTOR OF THE LINCOLN COMMISSION ON HUMAN RIGHTS,<br><br>Defendants. | ) | Case No. 4:26-cv-3339<br><br>**COMPLAINT FOR**<br><br>**INJUNCTIVE RELIEF**<br><br>**AND**<br><br>**DECLARATORY JUDGMENT** |

In support of their claims for relief against the Defendants, Plaintiffs state as follows:

## I. INTRODUCTION

1. This is a civil rights action pursuant to 42 U.S.C. § 1983 challenging the constitutionality of Lincoln Municipal Ordinances, Chapter 11.09 and §11.01.010 ("Sexual Orientation or Gender Identity Change Efforts") (hereinafter, "Ordinance"), which prohibit so-called "conversion therapy" for minors. Plaintiffs Thomas Dierks and John Doe, licensed mental health practitioners in Lincoln, Nebraska, seek a declaration that the Ordinance violates their First Amendment rights to provide purely talk therapy desired by their clients to align their sexual orientation or gender identity with their faith-based or other personal goals. The Ordinance also violates the Fourteenth Amendment due to vagueness. Plaintiffs seek a preliminary and permanent injunction prohibiting Defendants from enforcing the Ordinance.

2. On March 31, 2026, the United States Supreme Court's decision in *Chiles v. Salazar,* 607 U.S. 627*,* 146 S. Ct. 1010 (2026), found a statute using language nearly identical to Lincoln's Ordinance flagrantly discriminated based on viewpoint as applied to talk therapy and constituted an "egregious assault" on First Amendment values. 607 U.S. at 630. With equal force, *Chiles v. Salazar* stands to invalidate the Lincoln Ordinance.

3. Since *Chiles* was decided, Plaintiffs' attorneys have contacted the Lincoln City Attorney several times, beginning on April 16, 2026. By letter of that date, Plaintiffs requested the City of Lincoln to repeal the Ordinance no later than June 15, 2026. (Attached as Exhibit A.)

4. There followed one telephone call and two phone messages with the Lincoln City Attorney, who was acting on behalf of the City of Lincoln. Plaintiffs' attorneys also sent an email to the City of Lincoln on July 7, 2026, attaching *Bury v. Missouri*, an Eighth Circuit decision following *Chiles v. Salazar,* reversing a district court's failure to enjoin a Kansas City ordinance with nearly the same language as the Lincoln Ordinance. (Attached as Exhibit B.)

5. By way of another email on July 16, the Plaintiffs' attorneys then requested to know whether, even if the City of Lincoln is unwilling to repeal the Ordinance, the City of Lincoln at least is willing to agree not to enforce it as applied to talk therapy. (Attached as Exhibit C.) The City of Lincoln was informed in that email that if the City took no action, Plaintiffs would have no alternative but to sue

the City. The City of Lincoln has not responded to Plaintiffs' attorneys as of the date of this filing.

6. Plaintiffs Dierks and Doe are licensed Nebraska mental health counselors, who engage in counseling in the city of Lincoln, Nebraska.

7. Plaintiffs work with their clients to identify the clients' objectives and encourage the clients to achieve the goals they set for themselves, consistent with their own moral values and religious beliefs. In close relationships built on a strong foundation of trust and openness, Plaintiffs have seen their clients achieve great improvements in relationships, as well as in personal stability and happiness, simply by talking though the personal challenges they face. Plaintiffs' methods of practice are entirely comprised of talking.

8. Among a wide range of clients and issues, Plaintiffs have counseled minors about issues of gender identity and sexual attractions and behaviors. Plaintiffs' clients look to them for support in their lives, which at times can include pursuing meaningful and positive change, including if desired, changes in gender identity and sexual attractions and behaviors. All of these therapies are extremely sensitive and private conversations.

9. In passing the Ordinance and refusing now to repeal it, Lincoln governmental officials seek to insert themselves into the privacy of Plaintiffs' counseling rooms and to censor Plaintiffs' discussions with and exploration of certain ideas initiated at the requests of their young clients.

10. Specifically, the Ordinance prohibits, in vague and expansive terms, conversation or exchange of ideas between a trusted adult counselor and his minor client in pursuit of a goal "to change" that young person's gender identity or sexual attraction, orientation or behavior, even when the minor client seeks that change as his or her personal goal.

11. The Ordinance specifically states that it is prohibiting "Conversion Therapy," a term which carries a vague allusion to some undefined abuse or unpleasantness, which the Ordinance implied may have occurred somewhere, sometime in the past. The sponsors of the Ordinance have been unable to produce evidence that such allegedly abusive or aversive techniques, whatever they might be, ever occurred or are occurring in the Lincoln area.

12. Yet the Ordinance is not aimed at such abusive or aversive techniques. Rather than just outlawing specific allegedly abusive or aversive techniques, if any, the Ordinance instead purposefully prohibits a vast amount of pure speech, by design according to the Ordinance's sponsors. The Ordinance purposefully suppresses even simple discussions within a voluntary counseling relationship between a minor and a trusted, trained adult, in pursuit of personal goals set by the child or teenager.

13. The Ordinance penalizes only certain viewpoints, those helping "to change" certain behaviors or gender expression or sexual attraction, even when the child wants to make that change.

14. Despite politicized rhetoric to the contrary, there is a lack of reliable evidence that such talk therapy causes harm. Rather, the evidence shows such conversations have been effective at helping many young people achieve their own goals of aligning their sexuality or gender expression in accordance with personal faith or other beliefs.

15. The Ordinance threatens severe sanctions, including jail time, substantial fines, suspension from practice and loss of professional licenses for each instance of using words in therapy outlawed by the Ordinance. These draconian penalties apparently are intended to crush any professional counselor who opposes the government regime, and certainly to chill speech.

16. On the other hand, though, the Ordinance also expressly allows a counselor to "facilitate" and "support" a child's "exploration, and development" of "sexual orientation and gender identity," including assisting a child "undergoing gender transition." This presumably would include facilitating and supporting permanent sterilizing treatments and procedures to alter that young person's body to more closely match a perceived gender identity, which procedures now are generally outlawed for minors in Nebraska.

17. Thus, the Ordinance outlaws certain speech politically disfavored by the City of Lincoln, while at the same time, it officially encourages other speech furthering views favored by the City government. Through the Ordinance, City of Lincoln officials seek to impose uniformity of speech and to forbid a particular viewpoint on topics about which clients and counselors across the country hold

different viewpoints. These viewpoints are sometimes influenced by personal ideology, religious faith or lack of it and by different interpretations of what is "science." Lincoln City officials seek to establish themselves as the official arbiters of these topics and as the free-speech police over Lincoln therapists and the children they help, concerning such issues as sexual morality, human nature, personal identity, free will and religious convictions.

18. The United States Constitution does not permit governments to impose orthodoxy in thought, belief or speech. The government has no power to censor ideas and speech with which it disagrees, even if it believes those ideas to be wrong and personally offensive to certain governmental officials.

19. The First and Fourteenth Amendments powerfully protect the rights of both counselors and clients to speak freely between themselves on any topic, in pursuit of any personal goal, and guided by any religious or moral convictions.

20. The Ordinance is unconstitutional and unenforceable in its entirety, on its face, but particularly as applied to the Plaintiffs.

## II. JURISDICTION AND VENUE

21. This civil rights action, pursuant to 42 U.S.C. § 1983, raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

22. This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57, the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65 and costs and attorneys' fees under 42 U.S.C. § 1988.

23. Venue is proper in this Court under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the Defendants are located in this District.

## III. PARTIES

### A. Plaintiffs

24. Plaintiff Dierks is a licensed mental health practitioner in Lincoln, Nebraska. He has held a Nebraska behavioral health counseling license since 1999, and he graduated with a Masters in Social Work degree from the University of Nebraska at Omaha in 1996. He has been in active practice for over 27 years.

25. Mr. Dierks uses purely talk therapy to assist his clients, including minors, concerning a wide range of issues determined by the clients, which can include discussions relating to gender identity and sexual attractions and behaviors, including altering or changing their current status as to these issues, if the clients request.

26. Mr. Dierks is life-long, practicing Catholic Christian, and he welcomes prayer and discussion of spirituality if that is the client's desire.

27. Plaintiff Doe is a licensed mental health practitioner in Lincoln, Nebraska. He obtained a bachelor's degree in psychology from an accredited university, and a Master's degree in school psychology from another accredited university. He has held a Nebraska mental health counseling license and has been in active practice for over seven years.

28. Mr. Doe uses purely talk therapy to assist his minor clients, concerning a wide range of issues determined by the clients, which can include discussions relating to gender identity and sexual attractions and behaviors, including altering or changing their current status as to these issues, if the clients request.

29. Mr. Doe is a Christian and if prayer and religious belief are important to his clients, he includes these topics in the counseling sessions.

30. John Doe is not this Plaintiff's true name, and a motion to proceed pseudonymously will be forthcoming.

**B. <u>Defendants</u>**

31. Defendant City of Lincoln is a municipal corporation created and organized under the laws of the State of Nebraska. Its actions at issue in this case were performed under color of state law. It is an entity capable of being sued, including in the present case, and is capable of being sued under 42 U.S.C. § 1983. It enjoys no immunity from suit for the claims asserted herein.

32. Defendant Lincoln Commission on Human Rights is an administrative agency within the City of Lincoln government with the power to administer, receive

and investigate complaints and enforce aspects of the Ordinance challenged in this lawsuit. *Id*, §§ 11.09.030 to .075.

33. Defendant Jamie Reyes is the Director of the Lincoln Commission on Human Rights (whose positions formerly was known as the Human Rights Manager). Defendant Reyes oversees the daily operations and enforcement activities of the Lincoln Commission on Human Rights and is responsible for the investigation of complaints submitted to the Commission, supervising the Commission's investigators. She reports to the Lincoln City Attorney. Defendant Reyes is named as a defendant in her official capacity only.

34. All Defendants reside or exist in the District of Nebraska.

## IV. FACTUAL BACKGROUND

### A. <u>The Ordinance's Suppression of Politically Disfavored Speech</u>.

35. The Lincoln City Council adopted the Ordinance on February 22, 2021, Ord. 21043, and the Ordinance took effect after 15 days, pursuant to Lincoln City Charter, Art. V, Sec. 2. The Ordinance is codified at Lincoln Municipal Code, §§ 11.01.010 and 11.09.

36. The Ordinance added "sexual orientation or gender identity change efforts or conversion therapy with a minor" to the list of prohibited speech or conduct under Title 11 of the Lincoln City Code. *Id.,* §11.09.020.

37. The Ordinance prohibits any "Provider" from engaging in certain speech. "Provider" is defined to mean "any person licensed, certified, or registered

to provide counseling including, but not limited to, . . . licensed professional counselors, . . . psychologists, … social workers or any other person who performs counseling as part of the person's professional training." *Id.,* §11.01.010.

38. The Ordinance prohibits certain content in speech concerning "Sexual Orientation or Gender Identity Change Efforts (also called 'Conversion Therapy),'" using terms that are vague, content-based and biased against particular viewpoints:

> Sexual Orientation or Gender Identity Change Efforts also called 'Conversion Therapy') shall mean any counseling, practice, or treatment that seek to change a minor's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors or gender expression, or reduce or eliminate sexual or romantic attraction or feelings toward a person of the same gender. The definition encompasses the terms 'reparative therapy,' 'aversion therapy,' and 'reorientation therapy.' Sexual orientation or gender identity change efforts do not include counseling that does not seek to change sexual orientation or gender identity and that:
>
> 1. Assists a person undergoing gender transition;
> 2. Provides acceptance, support, and understanding to the person; or
> 3. Facilitates a person's coping, social support, identity exploration, and development, including sexual orientation and gender identity-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices.

*Id*., §11.01.010.

39. The Ordinance provides no definitions of the terms "gender transition," "coping," "social support," "identity exploration," "identity development," "gender identity," "gender expression" "sexual orientation" or "unsafe sexual practices." It provides no information at all as to what "behaviors" a therapist may not help a client attempt to change. *See id.*.

40. The Ordinance provides no explanation on how an individual can engage in "exploration and development" relating to sexual orientation or gender

identity without undergoing "change," or where the boundary between "exploration and development" and "change" might be. *See id.*.

41. The Ordinance does not distinguish whether the subjective intention to "*seek* to change" aspects of sexuality, *see id.*, is that of the therapist or of the client or of both. It does not state whether that intention must be explicit in order to violate the Ordinance, or whether a counselor may be accused based on alleged implicit intent.

42. The Ordinance prohibits only certain types of language. It only prohibits "Sexual Orientation … Change Efforts" that could be "also called 'Conversion Therapy.'" That is, only counseling to "change," rather than to support or intensify, one's sexual orientation or gender identity, is prohibited. That is irredeemably viewpoint based.

43. Further, the Ordinance specifically states that the prohibited "change efforts do not include counseling that does not seek to change sexual orientation or gender identity and that . . . *[a]ssists a person undergoing gender transition*." *Id.* § 11.01.010 (Change Efforts) (emphasis added). "Gender transition," which the Ordinance encourages, typically only refers to someone who claims a transgender status and who is moving away from acknowledgement of biological sex. A change moving the other direction, from transgender to comfort with biological sex, is typically referred to as "detransitioning." The Ordinance protects only efforts to transition, not to detransition. That too is blatantly viewpoint based.

44. The prohibitions of the Ordinance seek to enforce the Lincoln City Council's particular viewpoint about human sexuality, identity and morality. The City Council favors transgender identification with the opposite sex, and it favors sexual or romantic attractions toward individuals of the same sex, which therapists are only allowed to assist or facilitate, regardless of the wishes, goals and religious beliefs of the affected minor.

45. Many, if not most, religious faiths for countless generations have taught a different view concerning sexual morality and the proper place of sexuality in relation to one's identity, conduct, and relationships. Nevertheless, the Ordinance contains no meaningful religious exemption to protect the freedoms of counselors and clients to hold, speak, and act on such faith-based view of human nature, human sexuality and morality.

46. The Ordinance does not exempt from its sweep church-based religious providers and clients. Instead, the Ordinance bans "any counseling . . . that seek[s] to change a minor's sexual orientation or gender identity," *id*., even if that counseling is sought for religious reasons by clients seeking to align their sexual orientation or gender identity with their personal understanding of religious teachings.

## B. <u>The Ordinance Imposes Draconian Sanctions Against Professionals who Disagree with the Government's Ideology and who Continue to Exercise Their Constitutional Rights to Free Speech and Free Exercise of Religion</u>.

47. The Ordinance threatens severe sanctions against any therapist or counselor found to have violated its vague and viewpoint-based prohibitions. It threatens these penalties based on nothing more than private conversations and counseling that is requested by minor clients.

48. The Ordinance encourages activists and busy-bodies to interfere with private counseling relationships. It allows "[a]ny person who has reason to believe" a provider has violated the Ordinance's provisions to file a complaint to the Lincoln Commission on Human Rights ("the Commission"). *Id.*, § 11.09.030 (1).

49. Upon receiving a complaint, the Commission "shall investigate" the alleged violation. *Id.*, § 11.09.030 (3). If conciliation does not occur and there is "reasonable cause" to find a violation, the Commission "shall" charge the provider and conduct a public hearing adjudicating the claim. *Id.*, § 11.09.040 and .050. The Commission also may file a complaint merely "whenever there is *reason to believe*" a violation occurred. *Id.*, §11.02.040 (n) (emphasis added). Thus, the Ordinance lays out a nightmare scenario in which idealogues could harass nonconforming therapists and counselors by forcing them to defend themselves at hearings. The time and attention of the investigations and hearings alone, regardless of outcomes, are enough to chill Free Speech and Free Exercise.

50. The Ordinance amends Title 11 of the City Code. Therefore, each violation is deemed a criminal misdemeanor:

> Any person who shall willfully do or aid and abet in the doing of any act declared to be unlawful by the provisions of this title shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than $500.00 or by imprisonment in the county jail for not more than six months, or by both such fine and imprisonment. Each day such violation is committed or permitted to continue shall constitute a separate offense and shall be punishable as such hereunder.

*Id.*, § 11.01.060.

51. Moreover, violation also constitutes "unprofessional conduct" for purposes of the Uniform Credentialing Act, which covers any "[f]ailure to comply with any . . . municipal law, ordinance, rule, or regulation that pertains to the applicable profession." Neb. Rev. Stat. §38-179 (13). If a provider commits unprofessional conduct, his or her "credential to practice . . . may be denied, refused renewal, or have other disciplinary measures taken against it." Neb. Rev. Stat. §38-178 (24). *See also* Neb. Rev. Stat. §38-196 (1)-(6) (stating that license disciplinary action can include censure, probation, limitation, civil penalty, suspension, or revocation).

52. Additionally under the Ordinance, the Lincoln Commission on Human Rights, upon recommendation of the Hearing Officer, may impose a $100 "Civil Penalty" on the therapist or counselor "for each act of unlawful sexual orientation or gender identity change effort." Lincoln Municipal Code §11.09.050 (2).

53. Furthermore, this penalty is expressly "[i]n addition to the remedies and damages available to the Commissioner under Section 11.02.040," *id.*, which include Commission-recommended "damages based on actual pecuniary loss or such damages as the Commission or Commission-appointed hearing officer may determine should be assessed against a respondent violator." *Id.*, §11.02.040 (m).

54. The Commission can also require that the provider expressly promote a message with which he or she disagrees by mandating the provider to place "equal opportunity posters and materials as the Commission may deem appropriate" in his or her place of business. *Id.*

## C. **The Ordinance Expressly and Unconstitutionally Targets the Content of Plaintiffs' Speech and Promotes Viewpoint Discrimination, Including Against Religion.**

55. The political context of the Ordinance, to say nothing of its plain text discussed above, shows it directly targets certain types of speech and targets credentialed religious counselors.

56. The sponsor of the Ordinance acknowledged at two separate public hearings that the express purpose of the Ordinance is to prohibit even "talk therapy" on a particular viewpoint.

57. The Ordinance is not directed against specific practices such as so-called "aversion therapy" and implied abusive techniques, except in passing mention of the term. Instead the Ordinance targets specific ideas and personal goals. The intent of the Ordinance is to suppress ideas and advice with which the Lincoln City Council disagrees, restricting counseling in Lincoln, Nebraska, to viewpoints and advice that reflect the views of certain people.

58. Further, it is well known to both advocates and practitioners in the field, and on information and belief was well known to the sponsors of the

Ordinance, that many minors who seek counseling to change sexual orientation are motivated by religious convictions.

59. A substantial portion of those who testified in support of the Ordinance singled out "religious" counseling as the primary problem, whether or not that counseling was provided by a credentialed therapist.

### D. <u>The Ordinance is Practically Identical to the Law Reversed for Viewpoint-Discrimination in *Chiles v. Salazar* and Must Also be Found Constitutionally Infirm on That Basis</u>.

60. In *Chiles v. Salazar,* the United States Supreme Court reversed the lower court and found that a Colorado statute discriminated on the basis of viewpoint. 607 U.S. 627, 655 (March 31, 2026) (8-1, JJ. Kagan and Sotomayor concurring).

61. The Colorado statute that *Chiles* held to be Constitutionally infirm was nearly identical to the Lincoln Ordinance. In fact, the Lincoln Ordinance and the Colorado law are so similar that presumably they used the exact same template:

| **Colo. Rev. Stat. §12–245–224** | **Lincoln Mun. Code, Ch. 11.09, §11.01.010** |
|---|---|
| Forbids "any practice or treatment . . . that attempts or purports to change an individual's sexual orientation or gender identity" §12–245–202(3.5)(a) | Forbids "any counseling, practice, or treatment that seek to change a minor's sexual orientation or gender identity…" §§11.09.020, 11.01.010 (Change Efforts) |
| Forbids "efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." *Id.* | Forbids "efforts to change behaviors or gender expression, or reduce or eliminate sexual or romantic attraction or feelings toward a person of the same gender." *Id.* |
| Allows "practices or treatments that provide (I) Acceptance, support, and understanding for the facilitation of | Allows "counseling that does not seek to change sexual orientation or gender identity and that: … 2. Provides |

| | |
|---|---|
| an individual's coping, social support, identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change sexual orientation or gender identity…" §12–245–202(3.5)(b) | acceptance, support, and understanding to the person; or 3. Facilitates a person's coping, social support, identity exploration, and development, including sexual orientation and gender identity-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices." §11.01.010 (Change Efforts). |
| Allows "practices or treatments that provide… (II) Assistance to a person undergoing gender transition." *Id.* | Allows "counseling that does not seek to change sexual orientation or gender identity and that: 1. Assists a person undergoing gender transition..." *Id.* |
| Regulates "A person licensed, registered, or certified" who has engaged in "Conversion therapy with a client who is under eighteen years of age…" §12–245–224 (1)(t)(V). | Regulates counseling by a "Provider [which] shall mean any person licensed, certified, or registered to provide professional counseling…." §11.01.010 (Provider). |

62. The *Chiles* Supreme Court emphasized that it "has long held that laws regulating speech based on its subject matter or 'communicative content' are presumptively unconstitutional … trigger[ing] strict scrutiny …." *Chiles v. Salazar,* 607 U.S. at 640. The Supreme Court stated that it is "rare that [such] a regulation ... will ever be permissible." *Id.*

63. The *Chiles* Court continued,

> We have recognized, as well, the even greater dangers associated with regulations that discriminate based on the speaker's point of view. When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject, the violation of the First Amendment is all the more blatant. 'Viewpoint discrimination' … represents an egregious form of content regulation, and governments in this country must nearly always abstain from it.

607 U.S. at 641 (internal citations omitted).

64. In *Chiles v. Salazar*, the Supreme Court also put to rest the typical arguments governments have attempted to use to justify such blatant constitutional violations. It ruled against Colorado's attempt to resurrect the specious argument that professional speech should be subject to diminished constitutional protection (except in extremely narrow circumstances not found in the Colorado or Lincoln laws). *Id*. at 643, 646-47. The Supreme Court also ruled against Colorado's attempt to mischaracterize a counselor's talk therapy as "conduct" by labeling it as "treatment" or "therapeutic modality." *Id*. at 644-45 ("The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'") Likewise, a counselor's speech of this nature also cannot be mischaracterized as speech "incidental to conduct." *Id*. at 647-50.

## E. <u>There is Widespread Professional Disagreement Concerning the Underlying Factual Conditions on Which the Ordinance Allegedly was Based</u>.

65. There is significant disagreement in scientific literature as to the nature, causes and mutability of transgender identity and sexual orientation. There are substantial studies showing people, particularly young people, can and do change from transgender identity or same-sex orientation and do so with favorable mental health results.

66. Multiple studies have documented that a significant majority of pre-pubertal children who suffer from gender dysphoria will grow into comfort with a

gender identity congruent with their biological sex by young adulthood, so long as they are *not* assisted and facilitated as children to pursue a transgender identity.

67. There are increasing numbers of young adults who underwent varying degrees of hormonal and surgical "transition," but who later regretted that decision. Many now are publicly expressing that regret, increasingly in medical malpractice lawsuits, about the harm done to their bodies and minds, due to the too-hasty counsel and medical affirmation they received as minors that steered them into a transgender identity and the associated medical choices.

68. In June, 2025, the United States Supreme Court held in *United States v. Skrmetti* that Tennessee did not offend the Constitution by banning puberty blockers and hormone therapy for minors. The Supreme Court's decision referenced the 2024 Cass Report, commissioned by England's National Health Service, which "characterized the evidence concerning the use of puberty blockers and hormones to treat transgender minors as 'remarkably weak' and concluding that there is 'no good evidence on the long-term outcomes of interventions to manage gender-related distress.'" 605 U.S. 495, 524 (2025). Yet the Lincoln Ordinance overtly favors speech that "assists a [minor] person undergoing gender transition...." Lincoln Municipal Code, §11.01.010 (Change Efforts).

69. There is considerable disagreement among experts whether affirmation and facilitation of a transgender identity contrary to biology reduces actual suicide attempts by transgender youth, despite proponents' heavy reliance on that alleged result to prohibit so-called "conversion therapy." Instead, multiple

studies report that adolescents and adults who adopt and live in a transgender identity continue to suffer severely negative mental health outcomes, including suicide and attempted suicide, throughout their lives. This remains true even if they undergo the ultimate "gender-affirming" step of extensive surgery to reconfigure their body to conform in appearance to their gender identity.

70. Nonetheless, the Ordinance's alleged "Findings" blithely ignore conflicting scientific studies and ongoing disputes by simplistically concluding that any and all counseling attempts to change sexual orientation or gender identity necessarily lead to "serious harms" for minors. Lincoln Municipal Code, §11.09.010(2). The Ordinance thus reflects its drafters' political and metaphysical beliefs. It does not state undisputed factual findings. These drafters' beliefs do not arise even closely to a "compelling interest," as the Ordinance peremptorily alleges. *Id*. *See Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011) (where a law imposes a restriction on the content of protected speech, the government must prove a compelling interest and "bears the risk of uncertainty, . . . ambiguous proof will not suffice.").

71. Some minors who believe they are experiencing same-sex attractions may want to understand themselves better, to understand relationships and life experiences that may have produced those feelings in themselves, and to examine whether any of those influences, understandings, and feelings can be changed, so that they can pursue a life built around a heterosexual relationship that they desire, and that they believe their faith instructs them to pursue. Self-

understanding is difficult, and therefore they may wish to have a professional counselor assist them in that inquiry and effort. The Lincoln Ordinance does not allow children to receive such help from a trusted adult.

## F. The Plaintiffs' Mental Health Counseling Practices.

### Plaintiff Dierks

72. Mr. Dierks has counseled a wide range of individuals, including couples, individual adults, family groups, and adolescents, on various issues, depending on their needs.

73. Mr. Dierks' counseling approach is client-directed. He lets clients set their own goals for therapy.

74. Mr. Dierks uses purely talk therapy, primarily cognitive behavioral therapy, to assist clients in understanding, and if requested, altering patterns of thinking, managing personal conflicts such as relationship issues, and dealing with depression, anxiety, and loss or grief. He encourages clients to self-disclose freely, particularly about personal stressors and strained relationships.

75. Simplified, this amounts to sitting and talking with his clients. Mr. Dierks has conversations about what is happening in the clients' lives. He listens to their stories and learns about who they are. At times he asks questions to aid their own self-discovery. Through thoughtful discussion, ideas are exchanged and positions are discussed. This process allows clients to reflect on their identities and beliefs, as well as enables them to identify personal goals and objectives.

76. Mr. Dierks welcomes prayer and discussion of spirituality if that is the client's desire. Mr. Dierks is a life-long, practicing Catholic Christian, and his faith informs his views concerning human nature, healthy relationships, and what ways of thinking will enable his Christian clients to achieve comfort with themselves and live happy and satisfied lives. Mr. Dierks' Christian faith allows him to engage with his Christian clients in a manner that is particularly understanding and respectful of, and informed by, shared faith convictions. It also gives him a particular understanding and respect for his clients' personal goals that may be guided by the clients' faith convictions. This includes discussing, respectfully and sensitively, the clients' faith-influenced ideas about gender identity, sexual orientation and related behaviors.

77. Mr. Dierks assists his clients, including minors, concerning a wide range of issues determined by the clients. These issues can include discussions relating to gender identity and sexual attractions and behaviors, including altering or changing the clients' current approaches to these issues, when the clients state that they want to discuss such issues.

**Plaintiff Doe**

78. Although Mr. Doe has counseled a wide range of individuals, including couples and adults, he specializes in guiding children, adolescents, and young adults through life's challenges. Often, young people come to him specifically wanting to make a change in their life's circumstances and direction.

79. Mr. Doe's counseling approach is client-directed. Mr. Doe does not impose his values or objectives on clients, but rather he lets clients set their own goals for therapy.

80. Mr. Doe uses purely talk therapy, primarily cognitive behavioral therapy, to assist clients in understanding, and if requested, altering patterns of thinking, managing personal conflicts such as relationship issues, and dealing with depression, anxiety, and loss or grief. He encourages clients to self-disclose freely.

81. Simplified, this amounts to sitting and talking with his clients. Mr. Doe has conversations about what is happening in the clients' lives. He listens to their stories and learns about who they are. At times he asks questions to aid their own self-discovery. Through thoughtful discussion, ideas are exchanged and positions are discussed. This process allows clients to reflect on their identities and beliefs, as well as enables them to identify personal goals and objectives.

82. Mr. Doe recognizes that religious faith often affects mental health, and so he routinely asks new clients about their faith backgrounds. If prayer and religious belief are important to his clients, he includes such topics in their discussions. Mr. Doe is a Christian, and his hope is to use his God-given gifts to bless others by helping them live meaningful and positive lives.

83. It is not unusual for Mr. Doe's minor clients to present with issues related to sexual orientation and gender identity, which issues sometimes arise in the course of discussing other issues such as depression or anxiety. Sometimes minor clients want to change their sexual orientation or gender identity. Mr. Doe

requires that clients identify their own goals, and if change is their goal, at that point Mr. Doe enters into discussions to help his clients navigate and understand such issues.

## G. The Ordinance Harms Plaintiffs' Mental Health Practices and Violates Their First Amendment Rights.

84. Thus, both Plaintiffs in the past have worked with a minor who had issues related to same-sex attraction and corresponding lifestyles. Plaintiffs accompanied the clients as they explored the clients' questions. Plaintiffs expect with high confidence to continue to have opportunities for that type of practice in the future, particularly given Plaintiffs' visible identity as licensed Christian counselors.

85. Given the recent explosive increase in children and teen-agers who are experiencing gender dysphoria, and given Plaintiffs' visible identity as licensed Christian counselors, Plaintiffs expect with high confidence that minors will come to them in the future with issues related to gender identity and corresponding lifestyles and expect some of these minors to return to comfort with gender identities aligned with their biological sexes. Plaintiffs wish to provide such counseling for minors who want to engage in such conversational counseling on a strictly voluntary basis.

86. Given the apparently high need for additional counselors of his perspective, Plaintiff Dierks has intended to promote the aspect of his practice serving minor clients who seek help with issues relating to sexual attractions and

gender identity. He would have done so within the last few years, and would do so now, but for the Ordinance's prohibitions.

87. Plaintiffs experience a substantial and reasonable concern that hostile activists maliciously and dishonestly will present themselves or minors as clients in an effort to entrap the Plaintiffs and accuse them of violating the Ordinance.

88. Even in the case of clients who seek Plaintiffs' assistance entirely in good faith, Plaintiffs have reasonable concerns that other individuals, even unrelated individuals, could learn from clients of the nature of such counseling and file complaints against the Plaintiffs, or even initiate third-party enforcement actions as authorized by the Ordinance.

89. In practice, this has meant that conversations with clients on matters of gender, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions are inevitably likely to be more guarded and cautious than would otherwise be the case.

90. The vagueness and viewpoint-based targeting embedded in some of the terms and definitions in the Ordinance cause Plaintiffs to have reasonable concerns that almost any exploratory discussions they have with clients on matters of gender, gender expression, sexual orientation, sexual behaviors or sexual or romantic attractions could later be twisted or construed as violations of the Ordinance, casting a chill over all such conversations. Since these issues are very common matters of concern for troubled teens, this has a detrimental impact on both Plaintiffs and their clients.

91. The prospect of merely going through an investigative process if accused of a violation of the Ordinance—even though a violation ultimately is not proven—causes Plaintiffs reasonable concerns for the reasons stated above, but exacerbated by the potential that such a process could be accompanied by hostile and uninformed publicity.

92. These chilling effects are, or could become, inimical to healthy counseling relationships, which must be built on openness and trust between clients and their counselors.

93. If Plaintiffs and other license holders in Lincoln are barred from working with their clients on matters of gender, gender expression, sexual orientation, sexual behaviors or sexual or romantic attractions by the Ordinance, then those clients effectively are denied access to ideas that the clients may wish to hear and denied access to counseling that is consistent with their faith, goals and motivations.

94. Likewise, when Plaintiffs and other license holders in the City of Lincoln are driven by fear of the Ordinance and loss of their livelihoods to self-censor even in part the messages, ideas, encouragement, and support they would otherwise offer their clients, then those clients are effectively denied full and unfettered access to ideas they wish to hear, and to counseling that is consistent with their faith, goals, and motivations. Parents of affected minor clients are likewise deprived of their right to hear such ideas, and to direct the upbringing of their children.

95. Despite the difficulties and dangers listed above, Plaintiffs intend to continue working with clients struggling with these issues, because it is the right thing to do. Based on their many years of experience and current trends in youth culture, Plaintiffs expect to work with more minor clients with similar issues in the future.

**COUNT I**
**Denial of Plaintiffs' Free Speech Rights**
**Guaranteed by the First Amendment**
**(42 U.S.C. § 1983)**

96. Plaintiffs incorporate by reference all paragraphs above.

97. By purporting to censor what Plaintiffs may or may not say in the course of their professional counseling work, the Ordinance violates the Plaintiffs' First Amendment rights.

98. The Ordinance intrudes the censoring hand of government into one of the most private and sensitive spaces: the counseling room where an individual minor talks with a trusted adult counselor about personal concerns and goals.

99. Plaintiffs' right of free speech protected by the First Amendment includes the right to speak freely with their clients about their problems, questions, and goals. It includes the right to speak the ideas, suggestions, and advice Plaintiffs believe to be true and helpful. This right to speak freely and honestly is fully protected even if any of the Defendants disapprove of the client's chosen goals and disagree with Plaintiffs' views and advice. The central role of the First Amendment is to protect the right of individuals to speak their beliefs and views, even if the government disapproves.

100. The Ordinance is not a neutral time, place or manner regulation. Instead, it censors the conversations that a counselor and client may engage in based on the content of that speech and based on its viewpoint.

101. This is evident from the fact that determining whether a counselor or therapist's speech violates the Ordinance necessarily will require an inquiry into both the content and the viewpoint of that speech. Any contention to the contrary has now been categorically invalidated by the Supreme Court's directly-on-point decision in *Chiles v. Salazar* regarding a materially identical Colorado law.

102. The Ordinance does not impose neutral time, place or manner restrictions on counseling or therapeutic conversations generally. Instead, it purports to outlaw and punish only certain speech relating to specifically listed categories of content, including change to "sexual orientation or gender identity," change to "behaviors or gender expressions," and efforts to "eliminate or reduce romantic attractions or feelings towards a person of the same gender." Lincoln Municipal Code, §11.01.010 (Change Efforts).

103. As to these topics, the Ordinance prohibits only speech promoting a certain viewpoint concerning human sexuality, identity, morality, and free will: that is, the viewpoint that change in individuals' gender identity or sexual orientation to align with their natural reproductive biology is possible and may be a legitimate and desirable goal for some individuals.

104. The Ordinance is not viewpoint-neutral. It permits counseling that reflects "acceptance" and "facilitat[ion]" of "exploration and development" of gender

identity or sexual attractions or behaviors. It permits counseling that "[a]ssists a person undergoing gender transition." It does not permit ideas about "change" to "sexual orientation or gender identity." *Id.*

105. Therefore, far from being viewpoint and content neutral, the Ordinance actively aims to suppress the dissemination of ideas and information about human sexuality and the human capacity for change that are disfavored by certain members of the government of the City of Lincoln. The Supreme Court's recent decision in *Chiles v. Salazar* forecloses this approach.

106. The prohibitions of the Ordinance also seek to compel speech, by forcing licensed counselors to speak to clients in a manner that reflects the City's preferred belief that change to align an individual's feelings with their natural reproductive biology is not possible or desirable, regardless of the wishes, goals and religious beliefs of the individual affected.

107. The Ordinance does not adopt the least restrictive means to pursue a compelling government interest.

108. The government has no cognizable interest whatsoever, let alone a compelling interest, in preventing citizens from hearing ideas those citizens wish to hear from their chosen counselor or therapist.

109. The government has no cognizable interest whatsoever, let alone a compelling interest, in preventing the dissemination of ideas with which certain members of the city government disagree.

110. The Ordinance is overbroad rather than narrowly tailored. Assuming that there are particular physical or pharmaceutical practices the government may legitimately regulate to safeguard the physical and psychological well-being of a minor, the Ordinance makes no attempt at all to identify those practices and target its prohibitions against them.

111. The Ordinance is also severely underinclusive, because it allows counselors to "facilitate" a client's "exploration and development" of any sort of gender identity, sexual attractions or sexual behaviors whatsoever, with the sole exception of prohibiting a counselor from assisting a minor client who wishes to "change" "sexual orientation or gender identity."

112. For these reasons, the Ordinance is unconstitutional on its face as violating the Free Speech rights of counselors, protected by the First Amendment. It is also unconstitutional as applied to the Plaintiffs.

113. As a direct and proximate result of the Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiffs have suffered and will reasonably suffer in the future irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and damages, both nominal and compensatory, pursuant to 42 U.S.C. § 1983.

Wherefore, the Plaintiffs request that the Court grant declaratory relief against the Defendants pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, and injunctive relief against the Defendants

pursuant to Rule 65 of the Federal Rules of Civil Procedure, and award nominal and compensatory damages, as set forth in the Prayer for Relief.

**COUNT II**
**Denial of Plaintiffs' Free Exercise Rights**
**Guaranteed by the First Amendment**
**(42 U.S.C. § 1983)**

114. Plaintiffs incorporate by reference all paragraphs above.

115. Plaintiffs' rights of religious free exercise protected by the First Amendment include the right to use their professional skills to assist their clients to live in accordance with their own religious beliefs and equally to speak in the course of their professional work in a manner that is consistent with their own religious beliefs.

116. The Ordinance is premised on the belief that volitional change away from transgender identification, or away from same-sex attractions, is not possible and that any attempt to make such a change is harmful.

117. To the contrary, Plaintiffs, like many adherents of Christianity and other historic religions, believe based on their faith, as well as based on science, that this "unchangeable" view of human nature is mistaken, that such change is possible, and that change to a gender identity or sexual orientation aligned with an individual's reproductive biology can and does increase well-being at least in individuals who pursue this goal in obedience to their own religious convictions.

118. Further, Plaintiffs believe as Christians they have a religious obligation to use their time and professional skills to help fellow Christians who seek their assistance to live consistently with the teachings of their shared faith.

119. As applied to the Plaintiffs, the Ordinance substantially burdens the Plaintiffs' religious beliefs by requiring them to practice and speak in a manner contrary to those beliefs, prevents them from sharing religious beliefs about the possibility of change with clients in the course of discussions, and subjects the Plaintiffs to a risk of severe sanctions for speaking to minor clients consistently with their religious beliefs.

120. Because the Ordinance targets counseling goals and speech that are well known to be primarily associated with counselors and therapists of the Christian faith, the Ordinance is not neutral or generally applicable.

121. The Ordinance is also not neutral or generally applicable, because it imposes a viewpoint-based restriction on speech, directed against a viewpoint which is well known to be primarily associated with individuals of the Christian faith.

122. The Ordinance does not represent the least restrictive means of furthering a compelling state interest, as it is both overbroad and underinclusive. By depriving the Plaintiffs of the right to practice their religion by speaking to clients on topics of gender identity and sexual attractions and change in a manner consistent with the teachings of their faith, the Ordinance denies the Plaintiffs' rights of Free Exercise guaranteed by the First Amendment.

123. As a direct and proximate result of the Defendants' violation of the Free Exercise Clause of the First Amendment, the Plaintiffs have suffered and will reasonably suffer in the future irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and damages, both nominal and compensatory, pursuant to 42 U.S.C. § 1983.

Wherefore, the Plaintiffs request that the Court grant declaratory relief against the Defendants, pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, along with nominal and compensatory damages, as set forth in the Prayer for Relief.

**COUNT III**
**Denial of Plaintiffs' Due Process Rights,**
**Guaranteed by the Fourteenth Amendment,**
**as the Ordinance is Unduly Vague**
**(42 U.S.C. § 1983)**

124. The Fourteenth Amendment's guarantee of Due Process prohibits the government from imposing or threatening punishment based on laws that are so vague they do not provide fixed legal standards as to what is prohibited and what is not and so leave room for standardless or discriminatory enforcement.

125. Many of the key terms in the Ordinance are undefined in the Ordinance itself, and also undefined in science, having more in common with slogans.

126. As a result, the Ordinance is unconstitutional on its face, because it does not provide adequate standards or guidelines to govern the actions of those empowered to enforce it, including the Director and members of the Lincoln Commission on Human Rights. Instead, the Ordinance enables and authorizes those who are empowered to pursue enforcement actions, as well as entirely independent third parties filing complaints, to do so based on their personal predilections, rather than on any fixed legal standard, and likewise to pursue discriminatory enforcement.

127. The vagueness and lack of fixed legal standards in the Ordinance is particularly egregious, because it impacts a fundamental constitutional right. Due to this vagueness and the undue discretion it affords to those authorized to bring enforcement actions, counselors including Plaintiffs inevitably are likely to engage in a degree of self-censorship, consciously or unconsciously, that infringes the freedom of discussion of both counselor and client.

128. The Ordinance is unconstitutionally vague, because it provides no standards or guidelines defining the line between speech that permissibly seeks to "facilitate" a client's "identity exploration, and development" of gender identity or sexual orientation and speech that unlawfully seeks to "change" that person's gender identity or sexual orientation. *See* Lincoln Municipal Ordinances, §11.01.010 (Change Efforts).

129. Given that "development" necessarily involves "change," the Ordinance's purported distinction between them is incoherent. Thus, the Ordinance

leaves those authorized to bring enforcement actions free to do so based on their personal predilections or for discriminatory purposes, including disapproval of the beliefs, viewpoint or messages of a particular counselor.

130. The prohibition of speech that "seek[s] to change a minor's . . . gender identity," *id.*, also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions, because the term "gender identity" is undefined in the law and is vague.

131. The prohibition of speech that "seek[s] to change a minor's sexual orientation," *id.*, is also impermissibly vague, because the term "sexual orientation" is undefined in the Ordinance and is vague.

132. The Ordinance is further impermissibly vague because it prohibits any "counseling, practice, or treatment that seek to change a minor's sexual orientation or gender identity." *Id.* The Ordinance does not specify whether this refers to the subjective intent of the client, or that of the counselor, or both.

133. The client's personal intention in raising a subject relating to sexuality may or may not be known to the counselor and may change from one meeting to the next. Consequently, a counselor might face sanctions on the basis of the shifting subjective thoughts of his minor client that are beyond the counselor's knowledge.

134. The Ordinance is further impermissibly vague because it provides no definitions of terms "gender expression", "identity exploration", and "development" (presumably development of gender identity or sexual orientation, but it is not entirely clear.) *Id.*

135. The Ordinance provides no information at all as to what "behaviors" a therapist may or may not help a client attempt to change, nor what are "unsafe sexual practices" that a counselor permissibly may help a minor client avoid. *Id.*

136. Similarly, while the Ordinance encourages facilitation of a minor client's "coping" or "social support" regarding "sexual orientation or gender identity," *id.*, there are no definitions of what those actions entail, except that they cannot approach "change."

137. Further, the Ordinance states that its ban "encompasses the terms 'reparative therapy,' 'aversion therapy,' and 'reorientation therapy.'" *Id.* But it fails to define what any of these therapies are or if they are exactly the same as or in any way different from "Conversion Therapy," which the Ordinance bans.

138. In the absence of any clarity on these terms, a counselor is at risk that many counseling conversations that relates to gender, intimate relationships, or sexuality could be mischaracterized as seeking to "change . . . sexual orientation or gender identity." *Id.*

139. Further, the Ordinance also leaves wide discretion with government officials to determine whether counseling speech relating to gender, intimate relationships, or sexuality violate the Ordinance, which leaves impermissible room for arbitrary or biased enforcement.

140. The sanctions faced by therapists for violating the Ordinance are severe, ranging from jail time to multiple fines and the revocation of their licenses and the loss of their livelihoods. *See id.*, § 11.01.060 (jail time and criminal fines);

*id.*, §11.09.050 (2) (civil fines); Neb. Rev. Stat. §§38-178 (24) and 38-196 (1)-(6) (license disciplinary actions).

141. For these reasons, the Ordinance is so vague on its face that it deprives the Plaintiffs of Due Process rights protected by the Fourteenth Amendment.

142. As a direct and proximate result of the Defendants' violation of the Fourteenth Amendment's guarantee of Due Process, the Plaintiffs have suffered and will reasonably suffer in the future irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief and damages, both nominal and compensatory, pursuant to 42 U.S.C. § 1983.

Wherefore, Plaintiff respectfully requests that the Court grant declaratory and injunctive relief against the Defendants, pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, and nominal and compensatory damages, as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Plaintiffs request that this Court enter judgment against the Defendants and grant the Plaintiffs the following relief:

(A) A declaration that, both facially and as applied to the Plaintiffs, the Ordinance violates the Plaintiffs' Free Speech rights protected by the First Amendment to counsel minor clients who seek Plaintiffs' professional assistance to achieve comfort with a gender identity congruent with the client's biological sex, or

to reduce unwanted same-sex attraction and/or develop or increase opposite-sex attractions, or to change related sexual behaviors;

(B) A declaration that, as applied to the Plaintiffs, the Ordinance violates the Plaintiffs' Free Exercise of Religion rights protected by the First Amendment to counsel minor clients who seek Plaintiffs' professional assistance to achieve comfort with a gender identity congruent with the client's biological sex, or to reduce unwanted same-sex attraction and/or develop or increase opposite-sex attractions, or to change sexual behaviors of any sort;

(C) A declaration that, because aspects of the Ordinance are so vague, it does not provide fixed legal standards as to what is prohibited and what is not, and therefore, the Ordinance, facially and as applied to the Plaintiffs, violates the Plaintiffs' Due Process rights protected by the Fourteenth Amendment;

(D) Enter a preliminary injunction as soon as practicable enjoining the Defendants, and any other entities and persons set forth in Federal Rule of Civil Procedure 65(d)(2)), from enforcing the Ordinance;

(E) Enter a permanent injunction enjoining the Defendants, and any other entities and persons set forth in Federal Rule of Civil Procedure 65(d)(2), from enforcing the Ordinance;

(F) Award nominal damages to the Plaintiffs;

(G) Award Plaintiffs costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

(H) Issue the requested injunctive relief without a condition of bond or other security being required of Plaintiff;

(I) Grant any other relief that the Court deems equitable and just under the circumstances; and

(J) Retain jurisdiction over this matter for the purpose of enforcing its orders.

Respectfully submitted this 6th day of October, 2026.

/s/ Matthew F. Heffron
Matthew F. Heffron
(NE. Bar No. 19228)
Michael G. McHale*
THOMAS MORE SOCIETY
10506 Burt Circle, Suite 110
Omaha, Nebraska 68114
Telephone: (312) 782-1680
Fax: (336) 900-6535
mheffron@thomasmoresociety.org
mmchale@thomasmoresociety.org
**application for admission forthcoming*

Thomas Brejcha**
Peter Breen**
THOMAS MORE SOCIETY
121 West Wacker Drive, Suite 650
Chicago Illinois 60601
Telephone: (312) 782-1680
Fax: (336) 900-6535
tbrejcha@ thomasmoresociety.org
pbreen@thomasmoresociety.org
***pro hac vice application to be filed*